T.C. Memo. 2009-103

UNITED STATES TAX COURT

DEBORAH L. WATTS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6056-06.                    Filed May 18, 2009.

<u>Robert M. Walsh</u>, for petitioner.

<u>Daniel P. Ryan</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined a deficiency in petitioner's 2002 Federal income tax of $10,705 and additions to tax under section 6651(a)(1) of $2,408, under section 6651(a)(2) of $1,605, and under section 6654(a) of $357.

Unless otherwise noted, all section references are to the Internal Revenue Code of 1986, as in effect for the year in

issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts have been rounded to the nearest dollar.

After concessions,[1] the issues for decision are: (1) Whether a $52,896 payment petitioner received in 2002 in connection with the settlement of a class action lawsuit against her automobile insurer is includible in gross income; (2) whether $9,396 petitioner received from the Social Security Administration in 2002 is includible in gross income under section 86(a); (3) whether petitioner was required to file a Federal income tax return for 2002; (4) whether petitioner is

_____

[1]Respondent has conceded that petitioner is not liable for a sec. 6654(a) addition to tax. Petitioner claimed entitlement to a medical expense deduction in the petition but presented no evidence relating to this issue and did not address it on brief. We therefore deem it to have been abandoned. See Estate of Atkinson v. Commissioner, 115 T.C. 26, 35 (2000), affd. 309 F.3d 1290 (11th Cir. 2002); Stringer v. Commissioner, 84 T.C. 693, 708 (1985), affd. without published opinion 789 F.2d 917 (4th Cir. 1986).

Respondent determined in the notice of deficiency that petitioner had total unreported gross income for 2002 of $60,882 in connection with payments from State Farm Mutual Automobile Insurance Co. (State Farm) and the Social Security Administration. On brief respondent takes the position that petitioner had unreported income of $52,896 from State Farm and $9,396 from the Social Security Administration, for total unreported income of $62,292. Respondent did not move to amend his answer to assert an increased deficiency. In any event, the discrepancy in the unreported income respondent asserted has no significance, given that we have redetermined that petitioner had unreported income from State Farm and the Social Security Administration of only $2,896 and $6,455, respectively.

entitled to a dependency exemption deduction under section 151(c); (5) whether petitioner is entitled to a child tax credit under section 24(a); and (6) whether petitioner is liable for additions to tax under section 6651(a)(1) and (2).

FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated by this reference. At the time the petition was filed, petitioner resided in New Hampshire.

I.   State Farm Settlement Payment

A.   Petitioner's Automobile Accident

Petitioner married on October 8, 1990. On February 22, 1992, while living in Tuscon, Arizona, with her husband, petitioner was injured in an automobile accident, the fault of an uninsured motorist. As a result of her injuries, petitioner was unable to work for over a year.

At the time of the accident petitioner and her husband had two vehicles insured under separate automobile liability insurance policies through State Farm Mutual Automobile Insurance Co. (State Farm). Both insurance policies were purchased by petitioner and/or her husband and had endorsements for uninsured and underinsured motorist (UM/UIM) coverage with policy limits of $50,000.

B.    Petitioner's Claim Against State Farm

Although petitioner filed a lawsuit against the motorist who was at fault in her accident, her counsel ascertained that the defendant had no significant assets nor any insurance. Petitioner submitted a claim under her UM/UIM coverage to State Farm for compensation for her injuries in the automobile accident.  State Farm took the position that petitioner was entitled to recover under the UM/UIM coverage of only one of the two policies held by her and her husband, resulting in an effective policy limit on recovery of $50,000.  In taking this position State Farm relied on anti-stacking provisions in its insurance contracts with petitioner and her husband, under which the insured was purportedly precluded from aggregating or "stacking"[2] his or her UM/UIM coverages under multiple State Farm policies.  Petitioner thereafter agreed to settle her claim with State Farm for $32,973 and, after satisfaction of attorney's fees and costs, she and her husband received a payment of $21,887 on or about February 2, 1996.[3]  At the time she settled her claim, petitioner anticipated incurring future medical expenses on account of the automobile accident but concluded that the

_____

[2]"Stacking" is "the practice by which insureds may seek indemnification from the same coverage under two or more policies."  State Farm Mut. Auto. Ins. Co. v. Lindsey, 897 P.2d 631 (Ariz. 1995) (citing Widiss, Uninsured and Underinsured Motorist Insurance, sec. 40.1, at 237 (2d ed. 1995)).

[3]This 1996 payment is not at issue in this case.

settlement was advisable in view of the costs of further litigation and State Farm's position that the limit on her recovery was $50,000.

C.   Class Action Lawsuit Against State Farm

After petitioner had agreed to settle with State Farm, the Arizona Supreme Court decided State Farm Mut. Auto. Ins. Co. v. Lindsey, 897 P.2d 631 (Ariz. 1995), in which it held that anti-stacking provisions in certain other State Farm automobile liability insurance policies, similar to those that State Farm had invoked against petitioner, were ineffective to preclude stacking.  Id. at 331-332.

After the Lindsey decision petitioner became a member of the plaintiff class in a class action lawsuit against State Farm that had been filed on July 21, 1995, in Pima County Arizona Superior Court (superior court).  The class action plaintiffs alleged that "State Farm's refusal to allow Plaintiffs to 'aggregate' or 'stack' multiple uninsured and/or underinsured motorist coverages provided by State Farm policies constitutes a breach of contract."  The plaintiffs also raised claims for relief based on breach of covenant of good faith and fair dealing in connection with their contracts of insurance with State Farm, fraud in connection with the denial of benefits under the plaintiffs' policies, violation of the Arizona Consumer Fraud Act (A.R.S. 44-1522(A)) in connection with the denial of stacking of uninsured

coverage in multiple policies, breach of fiduciary duty, and racketeering as proscribed by A.R.S. 13-2301(D)(4).  The plaintiffs requested as relief compensatory damages, treble damages, punitive damages, attorney's fees and costs, and prejudgment interest.

### D.   Class Action Settlement Agreement

The class action lawsuit was settled on September 6, 2001, by means of a written settlement agreement (settlement agreement).  Pursuant to the settlement agreement, State Farm deposited into trust $45,062,945, of which $29,873,750 constituted "Class Member Settlement Funds" (settlement funds) to be used to pay certain of the plaintiffs; namely, "Eligible Class Members".[4]  Under the settlement agreement, each Eligible Class Member was entitled to receive a pro rata share of the settlement funds (plus interest accruing before disbursement) provided the Eligible Class Member executed and returned an individual release to State Farm.  Eligible Class Members included those plaintiff class members whom the superior court had ruled met the following criteria, as described in the settlement agreement:

> Any person (and each person who has a claim for the
> wrongful death of a person) who is, or was,

---

[4]The remaining funds were allocated to (1) "Seventh Year Class Members" whose claims apparently were subject to a greater litigation hazard that State Farm would prevail in a statute of limitations defense, and (2) attorney's fees and costs.

(A) insured under multiple automobile liability insurance policies that: (i) were purchased by one insured[5] on different vehicles; (ii) included uninsured ("UM") and/or underinsured ("UIM") motorist coverage; and (iii) were delivered or issued for delivery in Arizona by State Farm with respect to a motor vehicle registered or principally garaged in Arizona;

(B) who sustained injury or death as a result of the fault of an insured [sic[6]] and/or underinsured motorist; and

(C) who was paid * * * the UM and/or UIM motorist coverage limits on one automobile liability policy issued by State Farm, but received no payment from any other UM and/or UIM coverage provided by any other automobile liability policy described above.

The settlement agreement excluded from the category of Eligible Class Members: (1) "Identified Plaintiffs"; i.e., those class members whom the superior court concluded had policies with anti-stacking clauses that were valid and enforceable; and (2) "Fully Compensated Plaintiffs"; i.e., those class members whom the superior court concluded were fully compensated for their injuries and not entitled to any recovery in the litigation.

---

[5]We assume in deciding this case that petitioner was treated by State Farm and the Pima County Arizona Superior Court (superior court) as meeting the "one insured" requirement in connection with the policies purchased by her and/or her husband by virtue of Arizona's community property laws. See State Farm Mut. Auto. Ins. Co. v. Lindsey, 897 P.2d at 634.

[6]Given the context, we find that the use of the term "insured" in this clause of the settlement agreement was a typographical error and that "uninsured" was intended by the parties to the agreement.

As noted, an Eligible Class Member was required to execute a prescribed individual release in order to receive his or her pro rata share of the settlement funds. The terms of the prescribed individual release are not in the record. However, pursuant to the settlement agreement, every Eligible Class Member, regardless of whether he or she executed an individual release and received settlement funds, became subject to a general class release which released State Farm "from any and all claims, demands, suits, causes of action, damages, costs, fees, expenses, and civil liabilities of any nature whatsoever in law or equity arising from the transaction or occurrence giving rise to the claims in the [class action] Complaint".

### E. Receipt of Payment

Petitioner was one of 568 Eligible Class Members who received pro rata disbursements from the settlement funds that, with accrued interest, had grown to $30,041,902 as of January 31, 2002. Sometime in 2002 petitioner received a $52,896 payment pursuant to the settlement agreement as her pro rata portion of the settlement funds. During that year petitioner was issued a Form 1099-MISC, Miscellaneous Income, reflecting the payment.

## II. Social Security Administration Payments

During 2002 petitioner was disabled as a result of reflex dystrophy syndrome. She received payments totaling $9,396 from the Social Security Administration on account of this disability

and was issued a Form SSA-1099, Social Security Benefit Statement, reflecting the payments.

During 2002 petitioner and her husband were married but were experiencing marital difficulties.

III. Dependency Exemption Deduction and Child Tax Credit

Petitioner and her husband had two children during their marriage--TJM and TDM.[7]  Sometime around 2000 petitioner moved to New Hampshire.  As noted, petitioner remained married throughout 2002.  She and her husband obtained a final decree of divorce in 2005.  They had no written agreement concerning the custody of TJM and TDM during 2002.

IV. Tax Advice

Petitioner consulted an accountant as to the proper tax treatment of the $52,896 payment from State Farm.  The accountant advised petitioner that the payment might or might not be taxable and that petitioner should make further inquiry into its tax consequences.

V. Notice of Deficiency

Petitioner did not file a Federal income tax return for 2002.  Respondent prepared a substitute for return and on December 27, 2005, issued a notice of deficiency to petitioner for 2002 in which he determined that petitioner had unreported

---

[7]TJM was born on Sept. 13, 1993, and TDM was born on Dec. 17, 1996.

income of $60,882 as disclosed by third-party payors.[8]  Respondent further determined that petitioner's filing status was single, that petitioner was entitled to one personal exemption and no credits, and that petitioner was liable for additions to tax under section 6651(a)(1) and (2) as previously described. Petitioner filed a timely petition for redetermination.

OPINION

Generally, the determinations in the notice of deficiency are presumed correct, and taxpayers bear the burden of proving that the determinations are in error.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Petitioner has not claimed or shown entitlement to any shift in the burden of proof pursuant to section 7491(a).  As discussed infra, respondent bears the burden of production with respect to the additions to tax he determined, pursuant to section 7491(c).

Generally, gross income includes all income from whatever source derived unless excluded by a specific provision of the Internal Revenue Code.  See sec. 61(a); sec. 1.61-1(a), Income Tax Regs.  Section 61(a) broadly applies to any accession to wealth; statutory exclusions from income are to be narrowly construed.  See Commissioner v. Schleier, 515 U.S. 323, 327 (1995); United States v. Burke, 504 U.S. 229, 233 (1992); Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).  A

---

[8]See supra note 1.

taxpayer must demonstrate that he or she is within the clear scope of any statutory exclusion. See Commissioner v. Schleier, supra at 336-337; United States v. Burke, supra at 233.

I.  Unreported Income

A.  State Farm Settlement Payment

We first decide whether petitioner must include in her 2002 gross income the $52,896 payment she received pursuant to the settlement agreement with State Farm.

1.  Applicable Internal Revenue Code Provision

Petitioner contends that the settlement payment is excludable from gross income under section 104(a)(2) because it constitutes damages received on account of personal physical injuries she suffered in an automobile accident. Respondent counters that the payment was not to settle a tort claim or to pay petitioner on account of personal physical injuries but rather to redress contract claims. Thus, respondent argues the payment fails the two-part test under Commissioner v. Schleier, supra at 337, and therefore is not excludable from gross income under section 104(a)(2).

We believe the parties have miscast the issue as governed by section 104(a)(2). Section 104(a)(2) provides an exclusion from gross income for "the amount of any damages (other than punitive damages) received (whether by suit or agreement * * * ) on

account of personal physical injuries or physical sickness". The regulations interpreting section 104(a)(2) provide:

> Section 104(a)(2) excludes from gross income the amount of any damages received[9] (whether by suit or agreement) on account of personal injuries or sickness. The [statutory] term "damages received (whether by suit or agreement" means an amount received * * * through prosecution of a legal suit or action <u>based upon tort or tort type rights</u>, or through a settlement agreement entered into in lieu of such prosecution. [Sec. 1.104-1(c), Income Tax Regs.; emphasis added.]

Petitioner did not bring a suit, or settle one, based on tort or tort type rights. The suit and settlement at issue were not against the motorist whose fault caused her injury or against that motorist's insurer. Petitioner sued her own insurer concerning a disagreement over the contractual terms of policies she and her spouse had purchased--specifically, whether anti-stacking clauses in those policies entitled State Farm to deny coverage under the second policy. The settlement petitioner reached with State Farm was therefore not a "settlement agreement entered into in lieu of" a prosecution "based on tort or type rights"; it was a settlement of a contract dispute concerning the terms of an insurance policy she had purchased that purported to indemnify her against injury caused by an uninsured motorist.

---

[9]The regulations do not reflect the 1996 amendment of sec. 104(a)(2) wherein the phrase "(other than punitive damages)" was added after "damages". See Small Business Job Protection Act of 1996, Pub. L. 104-188, sec. 1605(a), 110 Stat. 1838.

Section 104(a)(3) generally provides an exclusion[10] from gross income for

> amounts received through accident or health insurance *
> * * for personal injuries or sickness (other than
> amounts received by an employee, to the extent such
> amounts (A) are attributable to contributions by the
> employer which were not includible in the gross income
> of the employee, or (B) are paid by the employer) * * *

The regulations interpreting section 104(a)(3) provide:

> Section 104(a)(3) excludes from gross income amounts
> received through accident or health insurance for
> personal injuries or sickness (other than amounts
> received by an employee, to the extent that such
> amounts (1) are attributable to contributions of the
> employer which were not includible in the gross income
> of the employee, or (2) are paid by the employer). * *
> * If, therefore, an individual purchases a policy of
> accident or health insurance out of his own funds,
> amounts received thereunder for personal injuries or
> sickness are excludable from his gross income under
> section 104(a)(3).  * * *  [Sec. 1.104-1(d), Income Tax
> Regs.]

Accordingly, under the regulations, where an individual has purchased an accident or health insurance policy, the section 104(a)(3) exclusion applies to amounts "received thereunder for personal injuries or sickness".

The regulations under section 104(a)(3) do not address the situation where the insured receives amounts only after initiation and settlement of a lawsuit against the issuer of the accident or health insurance policy.  The parties apparently believe that the interposing of a lawsuit between the insured and

---

[10]The exclusion does not extend to amounts attributable to deductions allowed under sec. 213 for any prior taxable year.

the insurer in this case causes the payment petitioner received from State Farm to constitute "damages" that may be excluded from income only by satisfying the requirements of section 104(a)(2). We disagree.  As more fully discussed below, we conclude that petitioner's settlement payment from State Farm was received "through" accident or health insurance "for" personal injuries or sickness within the meaning of section 104(a)(3) and is therefore excludable, up to the policy limits, under that section.

To decide whether the settlement payment petitioner received is excludable under section 104(a)(3), we must determine whether it constitutes an amount received (1) "through" (2) "accident or health insurance" (3) "for" personal injuries or sickness.  See Marsh v. Commissioner, T.C. Memo. 2000-11, affd. 23 Fed. Appx. 874 (9th Cir. 2002).

2.    Whether Petitioner's Automobile Liability Policy<br>Was "Accident or Health Insurance"

We believe there can be no serious dispute that petitioner's automobile liability policy on which State Farm denied coverage was "accident or health insurance" within the meaning of section 104(a)(3).[11]  In Marsh v. Commissioner, supra, we assumed that an amount received in settlement of litigation over a claim under the uninsured motorist coverage of an automobile liability

_____

[11]There is also no dispute in this case that the State Farm policies at issue were purchased by petitioner or her spouse and not by any employer of either.

insurance policy was in theory excludable under section 104(a)(3).[12] The Commissioner has taken a similar position in a published revenue ruling that disability payments received under a "no fault" automobile insurance policy are excludable under section 104(a)(3). See Rev. Rul. 73-155, 1973-1 C.B. 50. We accordingly hold that the uninsured motorist coverage in the State Farm automobile liability insurance policies at issue is "accident or health insurance" within the meaning of section 104(a)(3).

3.    Whether the Payment Was an Amount Received "Through" Accident or Health Insurance

Section 104(a)(3) requires that an excluded amount be received "through" accident or health insurance. The regulations further clarify that an amount is excludable if an individual has purchased the policy and the amounts are received "thereunder". Sec. 1.104-1(d), Income Tax Regs. Marsh v. Commissioner, supra, likewise involved a claim by an insured taxpayer for indemnification for a personal injury under the uninsured motorist coverage of his automobile liability policy. As in this case, the insurer denied coverage on grounds subsequently found invalid by the State's highest court in other proceedings. The

---

[12]In Marsh v. Commissioner, T.C. Memo. 2000-11, affd. 23 Fed. Appx. 874 (9th Cir. 2002), we held that an exclusion under sec. 104(a)(3) was not available because the claim that had been settled by the insurer was based on a false statement by the insured.

taxpayer thereupon sued, and the insurer ultimately settled with the taxpayer for approximately $68,000, which the taxpayer sought to exclude under section 104(a)(3) or (2).[13] A key difference in Marsh was our finding that the taxpayer's claim of personal injury was based on his false statement. As a result, we held that the payment was not excludable under section 104(a)(3) because it was not "for" personal injuries or sickness. We did not suggest that the payment's being a product of litigation with the insurer raised an issue under the requirement that the payment be received "through" accident or health insurance. Indeed, we assumed that a payment in these circumstances would be "under an insurance policy".[14]

Petitioner received the $52,896 payment at issue as her share of the settlement of a class action lawsuit against State Farm. In order to be eligible to receive the payment, petitioner was required to have been (1) insured under multiple (two or

---

[13]We found the taxpayer's position on brief unclear as between the two subsections, but the Commissioner's arguments assumed that the taxpayer was claiming an exclusion under sec. 104(a)(3).

[14]In this regard, we stated:

> section 104(a)(3) provides an exclusion from gross income of "amounts received through accident or health insurance for personal injuries or sickness". (Emphasis added.) The mere fact that amounts in question are paid by an insurance company under an insurance policy does not establish that such amounts were actually paid for injuries or sickness. * * * [Marsh v. Commissioner, supra.]

more) insurance policies purchased from State Farm with UM/UIM coverage, (2) injured through the fault of an uninsured or underinsured motorist, and (3) denied payment under one of the foregoing policies while receiving payment under another.

We are satisfied that these prerequisites establish that petitioner received the settlement payment "through" accident insurance, or under such a policy, within the meaning of section 104(a)(3) and the regulations. Petitioner's claim against State Farm in the class action lawsuit was at its core a demand for payment under the second of the two policies purchased by her and her husband with respect to which State Farm had denied coverage. That petitioner had to litigate to establish her rights to payment under the second policy does not change the conclusion that the payment was received "through" accident insurance. It is apparent that a primary issue in the litigation was the proper interpretation of the contractual terms of petitioner's policies. Certain members of the plaintiff class, the "Identified Plaintiffs", were excluded from any payment under the settlement agreement because the anti-stacking provisions in their policies had been found sufficient to support State Farm's denial of coverage. In these circumstances we are persuaded that State Farm settled with petitioner because the company believed there was a significant likelihood its denial of coverage under the second policy would be found improper. We accordingly conclude

that, but for her status as an insured under the second policy, petitioner would not have received the settlement payment.  We therefore hold that the settlement payment was received "through" accident or health insurance.

   4.   Whether the Payment Was Received "for" Personal
        Injuries or Sickness

Petitioner was a member of a plaintiff class whose members had sustained personal injury as the result of the fault of an uninsured or underinsured motorist but had been denied coverage under one or more of their State Farm policies with UM/UIM coverage.  Petitioner's eligibility to receive the payment at issue required, in addition to the foregoing, that she also not have been classified as a "Fully Compensated Plaintiff"; namely, a member of the plaintiff class whom the superior court had ruled had been fully compensated for his or her injuries.[15]  Only by meeting the foregoing requirements did petitioner become qualified to receive a pro rata distribution of the $29,873,750 settlement funds.

On the basis of these terms of the settlement agreement, we are satisfied that petitioner received her share of the settlement funds in significant part because she had

_____

[15]In order to qualify as an "Eligible Class Member", petitioner also must not have been classified as a "Seventh Year Class Member"; namely, a plaintiff class member whose claims under a State Farm policy had been the subject of an unsuccessful State Farm motion for summary judgment on the basis of the statute of limitations.

uncompensated personal injuries for which she had made a bona fide claim against her insurer for indemnification, which was settled.

Respondent argues, however, that the class action lawsuit involved a multitude of claims beyond those premised on personal injury (e.g., breach of contract, breach of covenant of good faith and fair dealing, fraud, violation of the Arizona Consumer Fraud Act, breach of fiduciary duty, and racketeering) and sought compensatory damages, treble damages, punitive damages, and prejudgment interest.[16]  Since the settlement agreement did not expressly allocate any portion of the payment to personal injury and petitioner became subject to a general release of all claims against State Farm, it cannot be said, respondent argues, that petitioner received the payment "for" personal injury.[17]  Rather, the argument goes, the payment was made in exchange for release of all claims against State Farm, and petitioner has failed to prove that any portion is attributable to personal injury.

---

[16]Although respondent's argument was directed at sec. 104(a)(2), we consider it to the extent it may apply to petitioner's entitlement to an exclusion under sec. 104(a)(3).

[17]Respondent also relies on Taggi v. United States, 35 F.3d 93 (2d Cir. 1994), and Morabito v. Commissioner, T.C. Memo. 1997-315, but this reliance is misplaced.  In both cases the taxpayers had never advanced a claim of any kind before receiving payment.  Petitioner formally sued State Farm, and the litigation was settled pursuant to a written settlement agreement.  Taggi and Morabito offer no guidance in this context.

We disagree.  While the general release may have extinguished all of petitioner's claims in the lawsuit, we find more persuasive the fact that petitioner's eligibility for a share of the settlement funds depended upon her showing that she had not been fully compensated for her injuries.  Petitioner's injuries were extensive.  She testified credibly that she was out of work for a year and that she anticipated medical expenses in future years as a consequence of her injuries when she settled her claim under the first State Farm policy in 1996.  In these circumstances we are persuaded that State Farm's payment to her, up to the $50,000 limit on UM/UIM coverage in her policy, was "for" personal injuries within the meaning of section 104(a)(3).

That leaves the excess of the settlement payment over the $50,000 coverage limit of the second policy; i.e., $2,896.  This amount could not have been indemnification under the policy "for" petitioner's personal injuries because State Farm's obligation under the policy did not extend that far.  Rather, we are persuaded that $2,896 of the settlement payment was for something else, either interest[18] or resolution of any claims that

---

[18]Petitioner has conceded that $302 of the $52,896 payment is taxable interest.  That concession is consistent with the undisputed facts.  State Farm initially deposited $29,873,750 into trust to be distributed pro rata to the 568 Eligible Class Members.  Petitioner's share of the original deposit would have been $52,595.  Petitioner's distribution was approximately $301 more than that.

petitioner was entitled to recover damages on account of State Farm's wrongful denial of coverage.

Consequently, we conclude that petitioner has shown that $50,000 of the payment at issue is excludable from gross income pursuant to section 104(a)(3) and has failed to show any basis for excluding the remainder.

B.   Social Security Payments

We now consider whether petitioner must include in her 2002 gross income the $9,396 of payments she received from the Social Security Administration, as respondent determined.

Petitioner's unchallenged testimony was that she was disabled in 2002 as a result of reflex dystrophy syndrome and received the payments from the Social Security Administration at issue as a result of that disability.  We accordingly find that the payments were Social Security disability insurance benefits.

Section 86 requires the inclusion in gross income of up to 85 percent of Social Security benefits received during the taxable year, including Social Security disability insurance benefits.  See sec. 86(a), (d);[19] see also Reimels v. Commissioner, 123 T.C. 245, 247 (2004), affd. 436 F.3d 344 (2d Cir. 2006); Joseph v. Commissioner, T.C. Memo. 2003-19; Thomas v. Commissioner, T.C. Memo. 2001-120.  Generally, under section

------

[19]Sec. 86(d)(1)(A) defines Social Security benefits to include amounts received under tit. II of the Social Security Act, 42 U.S.C. secs. 401-434 (2000), as amended, which include Social Security disability insurance benefits.  Id. sec. 423.

86(a)(1) Social Security benefits are includible in gross income "in an amount equal to the lesser of--(A) one-half of the social security benefits received during the taxable year, or (B) one-half of the excess described in subsection (b)(1)."  The excess described in subsection (b)(1) is the sum of the taxpayer's modified adjusted gross income (MAGI) and one-half of the Social Security benefits received during the taxable year, over the taxpayer's "base amount".  If the sum of the MAGI and one-half of the Social Security benefits received exceed the taxpayer's "adjusted base amount", then the amount of Social Security benefits includible in gross income is equal to the lesser of:

(A) the sum of--

(i) 85 percent of such excess, plus

(ii) the lesser of the amount determined under paragraph (1) or an amount equal to one-half of the difference between the adjusted base amount and the base amount of the taxpayer, or

(B) 85 percent of the social security benefits received during the taxable year.  [Sec. 86(a)(2).]

For purposes of section 86, a taxpayer's MAGI is her "adjusted gross income--(A) determined without regard to this section and sections 135, 137, 221, 222, 911, 931, and 933, and (B) increased by the amount of interest received or accrued by the taxpayer during the taxable year which is exempt from tax." Sec. 86(b)(2).  Section 86(c)(1)(C) defines the term "base amount" to mean "zero in the case of a taxpayer who--(i) is married as of the close of the taxable year (within the meaning

of section 7703) but does not file a joint return for such year, and (ii) does not live apart from his spouse at all times during the taxable year." Section 86(c)(2)(C) defines the term "adjusted base amount" to mean "zero in the case of a taxpayer described in paragraph (1)(C)."

Respondent determined that petitioner's sole item of gross income for 2002 other than her disability insurance benefits of $9,396 was the $52,896 payment from State Farm. We have redetermined that only $2,896 of the State Farm payment is includible in petitioner's 2002 gross income. As a consequence, none of the adjustments in section 86(b)(2) applies; petitioner's gross income, "adjusted gross income",[20] and MAGI in 2002 were the same--$2,896. Petitioner's "base amount" and "adjusted base amount" were both zero.[21] See sec. 86(c)(1)(C), (2)(C).

---

[20]Petitioner has not shown that she is entitled to any of the deductions under sec. 62 that would cause "adjusted gross income" to be less than "gross income".

[21]Petitioner's base amount was zero because she was a taxpayer described in sec. 86(c)(1)(C). Petitioner was married at the end of 2002, has not shown she satisfied the requirements of sec. 7703(b) to be treated as not married in 2002, and did not file a joint return for the year. See sec. 86(c)(1)(C)(i); see also Phillips v. Commissioner, 86 T.C. 433, 441 n.7 (1986), affd. in part and revd. in part on another issue 851 F.2d 1492 (D.C. Cir. 1988); Brunner v. Commissioner, T.C. Memo. 2004-187 (joint filing status not allowable unless a joint return is filed and made a part of the record before the case is submitted to the Tax Court for decision), affd. per curiam 142 Fed. Appx. 53 (3d Cir. 2005). Further, petitioner has not shown that she lived apart
(continued...)

Under section 86(b)(1), petitioner's MAGI ($2,896) plus one-half of the Social Security disability insurance benefits of $9,396 ($4,698) equals $7,594, which exceeds her "adjusted base amount" of zero. Accordingly, under section 86(a)(2) the amount of Social Security benefits includible in petitioner's gross income is equal to the lesser of $6,455 (85 percent of the excess of $7,594 ($6,455) plus zero[22]), or $7,987 (85 percent of the Social Security benefits received).

Accordingly, petitioner must include in her gross income for 2002 $6,455 of the $9,396 of Social Security disability insurance benefits she received during the year, pursuant to section 86.

II. Filing Requirement

We have redetermined that petitioner had gross income in 2002 totaling $9,351 (consisting of the $2,896 taxable portion of the State Farm payment and the $6,455 taxable portion of the Social Security benefits). As a consequence, the Court will consider sua sponte whether petitioner had an obligation to file a Federal income tax return for 2002.

---

[21](...continued)
from her former spouse "at all times" during 2002. See sec. 86(c)(1)(C)(ii). Petitioner's adjusted base amount was also zero because she is a taxpayer described in sec. 86(c)(1)(C). See sec. 86(c)(2)(C).

[22]One-half of the difference between the adjusted base amount (zero) and the base amount (zero) is zero, which is less than the amount determined under par.(1). See sec. 86(a)(2)(A)(ii).

Section 6012(a)(1) requires the filing of an income tax return by every individual having gross income for the taxable year which equals or exceeds the "exemption amount" (i.e., $3,000[23]) with four exceptions. Petitioner does not satisfy the first three exceptions (i.e., clauses (i), (ii) and (iii) of section 6012(a)(1)(A), which apply to unmarried individuals, (unmarried) heads of households, and surviving spouses, respectively) because she was married as of the close of 2002. Petitioner also fails to satisfy the fourth exception in clause (iv) of section 6012(a)(1)(A), which applies to an individual

> (iv) who is entitled to make a joint return and whose gross income, when combined with the gross income of his spouse, is, for the taxable year, less than the sum of twice the exemption amount plus the basic standard deduction applicable to a joint return, but only if such individual and his spouse, at the close of the taxable year, had the same household as their home.

Petitioner fails to satisfy the exception in clause (iv) in three respects. First, she is not entitled to file a joint return, since she had not filed such a return (or any return) as of the submission of this case for decision. See Phillips v. Commissioner, 86 T.C. 433, 441 n.7 (1986), affd. in part and revd. in part on another issue 851 F.2d 1492 (D.C. Cir. 1988);

---

[23]For purposes of sec. 6012, a taxpayer's "exemption amount" has the same meaning as provided in sec. 151(d). Sec. 6012(a)(1)(D)(ii). Sec. 151(d) provides that generally a taxpayer's "exemption amount" is $2,000 increased by a cost-of-living adjustment. Sec. 151(d)(1), (4). For taxable years beginning in 2002 the "exemption amount" under sec. 151(d) adjusted for the cost of living was $3,000. See Rev. Proc. 2001-59, sec. 3.11, 2001-2 C.B. 623, 626.

Brunner v. Commissioner, T.C. Memo. 2004-187, affd. per curiam 142 Fed. Appx. 53 (3d Cir. 2005). Second, petitioner has provided no evidence concerning her spouse's gross income in 2002. Third, petitioner has not shown that she and her spouse had the same household as their home at the close of 2002. The available evidence suggests the contrary; namely, petitioner testified that in 2002 her marriage was "dissolving" and that she and her husband "weren't really talking too much". Because petitioner did not satisfy any of the exceptions, she was required to file an income tax return under section 6012(a)(1) in that her gross income of $9,351 exceeded $3,000.

III. Dependency Exemption Deduction

We next consider whether petitioner is entitled to a dependency exemption deduction for 2002. Petitioner contends that she is entitled to a dependency exemption deduction for one of her children, while respondent's position is that she has failed to show entitlement because there is no evidence of the child's whereabouts or source of support during 2002. We agree with respondent.

Section 151(a) and (c) allows a taxpayer a deduction for each individual who is a dependent of the taxpayer as defined in section 152, including a child of the taxpayer who has not reached age 19 by the close of the taxable year. The allowance is conditional, however, on the taxpayer's including the

identifying number of the dependent on the return claiming the exemption.  See secs. 151(e), 7701(a)(41), 6109.  Section 152(a) defines a dependent in pertinent part to include a son of the taxpayer over half of whose support for the year was received from the taxpayer or is treated as received from the taxpayer under subsection (c) or (e) of section 152.

Section 152(e) provides special rules for treating one taxpayer as if he or she provided more than half the support of his or her child in the case of divorced parents, which for this purpose includes married individuals who, notwithstanding the absence of a divorce, legal separation, or written separation agreement, nonetheless "live apart at all times during the last 6 months of the calendar year".  Sec. 152(e)(1).  Application of section 152(e) also requires that the child receive over half of his support during the calendar from his parents and be in the custody of one or both of them for more than one-half of the calendar year.  Id.  If these conditions are met, the child is treated as receiving over half of his support from the parent having custody for a greater portion of the calendar year, id., or from the parent having custody for the lesser portion if the other parent releases his or her claim in a written declaration attached by the claiming parent to his or her return, sec. 152(e)(2).

Petitioner has failed to show that she satisfies any of the section 152 requirements for claiming either of her children as dependents. She has proven only that during her marriage she had two children who were minors during 2002. Beyond that, there is no evidence of the source of the children's support in 2002 or of which parent had custody over what period during that year. Petitioner asserts on brief that she provided over half of the support of one of her two children. However, statements on brief are not evidence. See Rule 143(b); Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 92 (2000), affd. 299 F.3d 221 (3d Cir. 2002).

Petitioner testified that she and her husband had an oral agreement covering 2002 under which petitioner was entitled to claim one of their children as a dependent. However, even a formal written agreement, incorporated in a State court decree, granting the dependency exemption deduction for a child to one parent is ineffective if the requirements of section 152 are not met. See Miller v. Commissioner, 114 T.C. 184, 193-194 (2000). It follows that any oral understanding between petitioner and her husband is likewise ineffective.

Given that the record does not establish the children's whereabouts in 2002, petitioner has failed to show either that she provided over half of the support of either child, as required under section 152(a), or that she should be treated as

providing over half of that support under section 152(e) because she had custody of the child for the greater portion of 2002 or had a <u>written</u> declaration from her husband releasing any claim to one of the dependency exemption deductions for their two children.[24] Respondent's determination that petitioner is entitled to only one personal exemption is therefore sustained.

IV.  Child Tax Credit

We turn to petitioner's claim of a child tax credit for 2002.

Subject to income limitations not pertinent here, a child tax credit is allowed with respect to each "qualifying child" of the taxpayer.  Sec. 24(a) and (b).  Section 24(c)(1) generally defines a "qualifying child" as a child of the taxpayer for whom the taxpayer is allowed a dependency exemption deduction under section 151 and who has not attained age 17.  Since we have concluded that petitioner is not entitled to a dependency exemption deduction for either TJM or TDM, neither child is petitioner's "qualifying child" under section 24(c).  Consequently, petitioner is not entitled to a child tax credit, and we sustain respondent's determination to that effect.

---

[24]The exceptions in sec. 152(e)(3) and (4) also do not apply.  There is no evidence that there was a multiple support agreement as defined in sec. 152(c) covering petitioner's children in 2002, and there was no pre-1985 instrument within the meaning of sec. 152(e)(4) applicable to them.

V.   Additions to Tax

Finally, we consider whether petitioner is liable for additions to tax under section 6651(a)(1) and (2).

Respondent bears the burden of production with respect to petitioner's liability for the additions to tax.  See sec. 7491(c).  In order to meet that burden, respondent must offer sufficient evidence to indicate that it is appropriate to impose the additions.  See Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Once respondent meets his burden of production, petitioner bears the burden of proving error in the determination, including establishing reasonable cause or other exculpatory factors.  Id. at 446-447.

A.   Section 6651(a)(1) Addition to Tax

Section 6651(a)(1) imposes an addition to tax for any failure to file a return by its due date.  The addition is equal to 5 percent of the amount required to be shown as tax on the return for each month or portion thereof that the return is late, up to a maximum of 25 percent.  See id.  The addition will not apply if it is shown that the failure to file a timely return was due to reasonable cause and not due to willful neglect.  See id.; see also United States v. Boyle, 469 U.S. 241, 245 (1985).  A failure to file timely is due to reasonable cause "If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed

time".  Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.; see <u>United States v. Boyle</u>, <u>supra</u> at 246.  Willful neglect is interpreted as a "conscious, intentional failure or reckless indifference." <u>United States v. Boyle</u>, <u>supra</u> at 245.

As previously discussed, we have sustained respondent's determination that petitioner had gross income in 2002 to the extent of $9,351, which exceeded her exemption amount.  She was therefore required to file a return for 2002.  See sec. 6012(a)(1).  Petitioner's return for 2002 was due on April 15, 2003, in the absence of any extensions.  See secs. 6072(a), 6081(a).  The parties stipulated that petitioner did not file a return for 2002.  The foregoing satisfies respondent's burden of production under section 7491(c) and establishes petitioner's liability for the section 6651(a)(1) addition to tax unless petitioner can establish reasonable cause for her failure to file timely.  See <u>Higbee v. Commissioner</u>, <u>supra</u> at 446.

Petitioner has not made an explicit claim that she had reasonable cause for her failure to file.  She testified, however, that she consulted an accountant regarding the proper tax treatment of the payment she received from State Farm and that he advised her that it might or might not be taxable and that she should make further inquiry.  Assuming this testimony should be treated as a claim of reasonable cause, it falls short. While it is true that the receipt of professional advice to the

effect that the taxpayer does not have a tax liability or filing obligation may constitute reasonable cause for a failure to timely file, see, e.g., United States v. Boyle, supra at 250-251 & n.9; Zabolotny v. Commissioner, 97 T.C. 385, 400-401 (1991), affd. in part and revd. in part on other grounds 7 F.3d 774 (8th Cir. 1993), petitioner received no such advice regarding her obligations with respect to the State Farm payment and no advice whatsoever regarding the Social Security payments.  We accordingly conclude that petitioner did not have reasonable cause for her failure to file, and we sustain respondent's determination of the addition to tax under section 6651(a)(1), with the "amount required to be shown as tax on * * * [the] return" computed in a manner consistent with petitioner's gross income as redetermined herein.

B.   Section 6651(a)(2) Addition to Tax

Section 6651(a)(2) imposes an addition to tax for any failure to pay the tax shown on a return on or before the date prescribed for payment of such tax.  The addition is equal to 0.5 percent of the amount shown as tax on the return for each month, or fraction thereof, during which the failure to pay continues, up to a maximum of 25 percent.[25]  See id.  The date prescribed for

---

[25]The sec. 6651(a)(1) addition to tax is reduced by the amount of the sec. 6651(a)(2) addition for any month (or fraction thereof) to which an addition to tax applies under sec. 6651(a)(1) and (2).  See sec. 6651(c)(1).

payment of income tax is the due date for filing the return determined without regard to any extension of time for filing. See id.

The addition applies only when an amount of tax is shown on a return. See Wheeler v. Commissioner, 127 T.C. 200, 208 (2006); Cabirac v. Commissioner, 120 T.C. 163, 170 (2003). A substitute for return (SFR) made by the Secretary under section 6020(b) is treated as "the return filed by the taxpayer for purposes of determining the amount of the addition" under section 6651(a)(2). Sec. 6651(g)(2). For these purposes, an SFR "must be subscribed, it must contain sufficient information from which to compute the taxpayer's tax liability, and the return form and any attachments must purport to be a 'return'." Spurlock v. Commissioner, T.C. Memo. 2003-124; see also Cabirac v. Commissioner, supra at 170-171.

The addition will not apply if it is shown that the failure to pay timely was due to reasonable cause and not due to willful neglect. See sec. 6651(a)(2). A failure to pay is due to reasonable cause if the taxpayer "exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship * * * if he paid on the due date." Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.; see Merriam v.

<u>Commissioner</u>, T.C. Memo. 1995-432, affd. without published opinion 107 F.3d 877 (9th Cir. 1997).

As noted, petitioner did not file a return for 2002. Respondent, pursuant to section 6020(b), prepared an SFR for 2002 showing tax due of $16,822.[26]  The SFR qualifies as a valid return for purposes of section 6651(a)(2).  Petitioner failed to pay timely her 2002 tax liability as shown on the SFR.  These undisputed facts satisfy respondent's burden of production under section 7491(c) and establish petitioner's liability for the section 6651(a)(2) addition to tax unless petitioner can establish reasonable cause for her failure to pay timely.  See <u>Higbee v. Commissioner</u>, 116 T.C. at 446.

Petitioner was disabled during 2002 and 2003.  Although petitioner testified at trial that she received Social Security disability insurance benefits in 2002, there is no other evidence of her financial circumstances at that time.  On this record, we are unable to conclude that petitioner was unable to pay her tax due or that she would have suffered undue hardship if she had paid the tax on its due date.  See <u>Guterman v. Commissioner</u>, T.C. Memo. 2008-283; <u>Bray v. Commissioner</u>, T.C. Memo. 2008-113; see also sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

---

[26]The tax was calculated on the basis of the same adjustments subsequently determined in the notice of deficiency.

We therefore hold that petitioner has not shown reasonable cause with respect to the section 6651(a)(2) addition to tax, and we sustain respondent's determination of the section 6651(a)(2) addition to tax for 2002, reduced in accordance with section 6651(c)(2) to reflect our redetermination of petitioner's gross income for 2002.

To reflect the foregoing,

Decision will be entered under Rule 155.